# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JACK ALLEN WILSON, | 1:01-cv-06538-LJO-GSA (PC) |
| Plaintiff, | FINDINGS AND RECOMMENDATIONS RECOMMENDING DENIAL OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND PARTIAL GRANTING/DENIAL OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |
| v. | |
| C.A. TERHUNE, et. al., | |
| Defendants. | |
| _____/ | (Docs. 139-1 & 148-1) |

## I.    Procedural History

Plaintiff, Jack Allen Wilson, ("Plaintiff") is a state prisoner proceeding pro se in this civil rights action pursuant to 42 U.S.C. § 1983.  This action is proceeding on Plaintiff's second amended complaint, filed January 6, 2004, against Defendants Terhune, Presley, Galaza, Yee, and Bendon ("Defendants") for enacting, implementing, and/or enforcing policies and/or practices that resulted in deliberate indifference to Plaintiff's serious medical needs, in violation of the Eighth Amendment.  (Doc. 45.)  Plaintiff also alleged claims for relief based on violations of California law for professional negligence/medical malpractice and intentional infliction of emotional distress.

On February 6, 2007, Plaintiff filed a motion for summary judgment.  (Doc. 139-1.)  On May 7, 2007, Defendants filed an opposition and a cross-motion for summary judgment. (Doc. 148-1.)  Plaintiff filed an opposition to Defendant's cross-motion on September 26, 2007.  (Doc.

1    156.)  Neither party filed a reply.[1]

2    **II.    <u>Summary Judgment Standards</u>**

3    Summary judgment is appropriate when it is demonstrated that there exists no genuine

4    issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

5    Fed. R. Civ. P. 56(c).  Under summary judgment practice, the moving party

6              [A]lways bears the initial responsibility of informing the district
             court of the basis for its motion, and identifying those portions of
7            "the pleadings, depositions, answers to interrogatories, and
             admissions on file, together with the affidavits, if any," which it
8            believes demonstrate the absence of a genuine issue of material
             fact.
9
10   <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  It is the moving party's burden to establish

11   that there exists no genuine issue of material fact and that the moving party is entitled to

12   judgment as a matter of law.  <u>British Airways Board v. Boeing Co.</u>, 585 F.2d 946, 951 (9th Cir.

     1978).

13   "When the moving party does not have the burden of proof on the issue, he need show

14   only that the opponent cannot sustain his burden at trial."  <u>Calderone v. United States</u>, 799 F.2d

15   254, 259 (6th Cir. 1986) (quoting from W. Schwarzer, <u>Summary Judgment Under the Federal</u>

16   <u>Rules: Defining Issues of Material Fact</u> 99 F.R.D. 465, 487 (1984)).   "But where the moving

17   party has the burden - the plaintiff on a claim for relief or the defendant on an affirmative defense

18   - his showing must be sufficient for the court to hold that no reasonable trier of fact could find

19   other than for the moving party."  <u>Id</u>.  Thus, as to Plaintiff's motion for summary judgment,

20   Plaintiff must demonstrate there is no triable issue as to the matters alleged in his complaint.  <u>Id</u>.

21   This requires Plaintiff to establish beyond controversy every essential element of his Eighth

22   Amendment claim.  <u>Houghton v. South</u>, 965 F.2d 1532, 1536 (9th Cir. 1992); <u>Fontenot v.</u>

23   <u>Upjohn Co.</u>, 780 F.2d 1190, 1194 (5th Cir. 1986).  Plaintiff's evidence is judged by the same

24   standard of proof applicable at trial.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242 (1986).

25   As to Defendant's motion for summary judgment, "where the nonmoving party will bear

26

27

28        [1] Plaintiff was provided with notice of the requirements for opposing a motion for summary judgment by the
     Court in an order filed on April 4, 2005.  <u>Klingele v. Eikenberry</u>, 849 F.2d 409 (9th Cir. 1988).  (Doc. 49.)

the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'"  Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Id. at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Id.  In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963

1   amendments).

2        In resolving the summary judgment motion, the Court examines the pleadings,

3   depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

4   any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed, <u>Anderson</u>, 477

5   U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the

6   Court must be drawn in favor of the opposing party, <u>Matsushita</u>, 475 U.S. at 587 (citing <u>United

7   States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962) (per curiam).  Nevertheless, inferences are not

8   drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from

9   which the inference may be drawn.  <u>Richards v. Nielsen Freight Lines</u>, 602 F. Supp. 1224, 1244-

10  45 (E.D. Cal. 1985), <u>aff'd</u>, 810 F.2d 898, 902 (9th Cir. 1987).

11       Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

12  show that there is some metaphysical doubt as to the material facts.  Where the record taken as a

13  whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine

14  issue for trial.'"  <u>Matsushita</u>, 475 U.S. at 587 (citation omitted).

15       "[W]hen parties submit cross-motions for summary judgment, [e]ach motion must be

16  considered on its own merits."  <u>Fair Hous. Council of Riverside County, Inc. v. Riverside Two</u>,

17  249 F.3d 1132,  1136 (9th Cir. 2001) (internal quotations and citation omitted).

18  **III.   <u>Undisputed Facts</u>**[2]

19  1.     Plaintiff was housed at California State Prison-Corcoran (CSP-Corcoran) at all times

20

21       _____

22       [2] A party moving for summary judgment is required to submit a Statement of Undisputed Facts which
     "enumerate[s] discretely each of the specific material facts relied upon in support of the motion and cite[s] the
     particular portions of any pleading, affidavit, deposition interrogatory answer, admission or other document relied
23   upon to establish that fact."  Local Rule 56-260(a).  Both sides submitted a Statement of Undisputed Facts to support
     their respective motions.  Defendants also responded to that of Plaintiff's in a Statement of Disputed Fact.  In
24   opposition to Defendants' motion, rather than submitting a Statement of Disputed Fact, Plaintiff submitted a second
     Statement of Undisputed Fact, which is not identical to that in his moving papers, and does not specifically identify
     disputes with any of Defendants' moving undisputed facts.  Despite this procedural deficiency, which renders the
25   motions more burdensome than they ought to be, the Court has opted to consider Plaintiff's verified second amended
     complaint, and both of his Statements of Undisputed Facts to identify any facts in Defendants' Statement of
26   Undisputed Facts that Plaintiff disputes. Plaintiff's motion is verified and may be treated as a declaration.  <u>Moran v.
     Selig</u>, 447 F.3d 948, 759-60 (9th Cir. 2006); <u>Jones v. Blanas</u>, 393 F.3d 918, 923 (9th Cir. 2004); <u>Johnson v. Meltzer</u>,
27   134 F.3d 1393, 1399-1400 (9th Cir. 1998).  Plaintiff also submitted his own declaration in support of the motion,
     along with other documentary evidence.  Further, Plaintiff's second amended complaint is verified and may be
28   treated as a declaration.  <u>Id</u>.

1    material to the matters at issue.

2    2.    Defendant C. Terhune was Director of the CDCR; defendant Presley was the Secretary of

3          the Youth and Adult Corrections Agency; defendant Galaza was the Warden at CSP-

4          Corcoran; and defendants Yee and Bendon were Chief Medical Officers and Health Care

5          Managers at CSP-Corcoran at times material to the matters at issue.

6    3.    Plaintiff was admitted to the custody of CDCR on July 31, 1997.

7    4.    Plaintiff transferred to CSP-Solano on November 6, 1997 and to California Men's Colony

8          (CMC) on March 4, 1999.

9    5.    On March 4, 1999, Dr. Viggianelli (at CMC) ordered lab work for Plaintiff.  The lab

10         report showed that his blood sugar level was 520.

11   6.    Plaintiff was seen by Dr. Viggianelli on March 8, 1999.  Dr. Viggianelli ordered a

12         diabetes medication, glucoscans (finger-sticks), and that Plaintiff would commence a low

13         fat, low concentrated sweet diet.

14   7.    On September 19, 2000, Dr. Viggianelli ordered Plaintiff to have his blood sugar levels

15         tested four times a day for the remainder of Plaintiff's time at that facility.[3]

16   8.    Plaintiff was transferred to CSP-Corcoran on December 14, 2000.

17   9.    On January 18, 2001, Plaintiff was seen by Dr. Meis at CSP-Corcoran.  Plaintiff

18         explained to Dr. Meis that he had frequent drops in his blood sugar levels causing

19         symptoms.[4]  Dr. Meis ordered a diabetic snack.

20   10.   On March 23, 2001, Plaintiff filed an appeal/grievance requesting to be allowed to

21         receive food from the outside.  His appeal was denied at the first level stating "... CSP-

22         Corcoran provided inmates with a well-balanced diet, as well as enough calories to

23         sustain the needs of inmates with Diabetes.  Should you feel that you require more

24         calories than what you are currently afforded, you are authorized to receive quarterly

[3]Plaintiff indicates that this order was for the remainder of his stay at that facility, and Defendants indicate that it was for the rest of the year – which is essentially the same time frame since Plaintiff was transferred to CSP-Corcoran in December of that year.  (Doc. 157, 2:16-18 and Doc. 149-1, 3:25-26.)

[4]The symptoms indicated by the parties differ slightly.  (Doc. 157, 2:18-23 and Doc. 149-1, 3:27-28.)

packages, and can have approved food items sent in to you in that fashion."

11.   On April 2, 2001, Plaintiff wrote defendant Doctors Bendon and Yee (HCM/CMO) by submitting a CDC GA-22 request for interview form with a letter attached complaining about the poor care he was receiving for his out-of-control diabetes.  No response to these complaints were given.

12.   On May 1, 2001, Plaintiff filed an appeal/grievance requesting a blood glucose testing machine and testing supplies.  This appeal was denied at the first level of review by Dr. Meis.

13.   On May 5, 2001, Plaintiff filed a State Tort Claim for professional negligence, medical malpractice, and intentional infliction of emotional distress, as Plaintiff suffered injuries which included unnecessary discomfort, pain and intentional infliction of emotional distress when defendants failed to summon adequate medical care for daily diabetic diets, finger-sticks up to 8 times per day, and daily exercise out-of-cell all which is necessary to monitor and control his diabetes.

14.   On July 18, 2001, Dr. Meis ordered finger-sticks for Plaintiff two times per week.[5]

15.   On November 21, 2001, Dr. Pillor noted that Plaintiff's blood sugar level was 446.

16.   On November 28, 2001, Plaintiff was seen for chest pains, and Plaintiff indicated that he had fallen.

17.   On February 11, 2002, Plaintiff was seen by the Dietician for his diabetes.  The Dietician told Plaintiff that he could decrease his intake of food because she thought he was overweight; that he needed to pick and choose from the foods offered on the general population menus; and that diabetic inmates were on regular prison food without problems.

18.   On March 7, 2002, Plaintiff submitted a grievance requesting oatmeal which had been mailed to him in a quarterly package by his family and was being held at CSP-Corcoran's Receiving and Release (R&R).  This appeal was denied through the director's third level

---

[5]Plaintiff indicates that this order was for only one month, while Defendants do not address the duration of this order.  The order itself is non-specific.

1    of review.

2    19.    On March 14, 2002, Plaintiff was seen by Dr. Bhatt.  Plaintiff was told by Dr. Bhatt that

3           he could use a wheelchair on an "as needed" basis, but that he needed to get out of the

4           wheelchair entirely.

5    20.    On April 17, 2002, Dr. Bendon answered Plaintiff's appeals – which Plaintiff began filing

6           on July 8, 2001.

7    21.    On May 1, 2002, Plaintiff filed a grievance requesting a machine to test his blood sugar.

8    22.    On August 5, 2002, Plaintiff was seen by Dr. Friedman who recommended that Plaintiff

9           be placed on insulin until his glucose was under control.

10   23.    On August 5, 2002, Plaintiff was seen by Dr. Bhatt at the Acute Care Hospital.  Dr. Bhatt

11          noted that Plaintiff suffered with diabetes mellitus and gout.

12   24.    Plaintiff was transferred to CSP Avenal on December 2, 2002.

13   25.    On December 23, 2002, Dr. Douglas placed Plaintiff on insulin twice a day.

14   26.    The outline for therapeutic diets are set forth in Chapter 20 of the Policies and Procedures

15          issued by CDCR's Health Care Services Division.

16   27.    There is a standardized heart healthy menu for all prisons in California, designed to meet

17          the nutritional needs of normal, healthy adults.

18   28.    Inmates with certain health conditions, such as diabetes, are to receive dietary education

19          provided by health care services staff so that they can manage their meals responsibly.[6]

20   **IV.    Discussion**[7]

21          Both parties assert that they are entitled to judgment as a matter of law.

22          **A.  Plaintiff's Allegations**

23          The Court screened Plaintiff's second amended complaint, and found it only stated

24   _____

25          [6]Plaintiff states that he did not receive such instruction, but not that the policy is for such instruction not to
     be given.

26          [7] The Court has reviewed Plaintiff's second amended complaint, the cross-motions for summary judgment,
27   and the oppositions.  The Court declines to exhaustively list every argument forwarded, every fact recited, and every
     piece of evidence submitted by the parties.  Omission in this findings and recommendation of reference to various
28   arguments, facts, or evidence should not be interpreted by the parties as an indication that the Court overlooked that
     argument, fact, or piece of evidence.

cognizable claims against Defendants Terhune, Presley, Galaza, Yee, and Bendon for enacting, implementing, and/or enforcing policies and/or practices that resulted in deliberate indifference to Plaintiff's serous medical needs, in violation of the Eighth Amendment – noting that Plaintiff also alleged claims for relief based on violations of California law for professional negligence/medical malpractice and intentional infliction of emotional distress.  (Doc. 45.)

Generally, Plaintiff claims that the policies and procedures implemented and enforced by Defendants failed to provide him with the proper diet, sufficient daily finger-sticks to monitor his blood sugar levels, and sufficient out-of-cell exercise so as to amount to deliberate indifference to his serious medical needs (diabetes).  Further, Plaintiff alleges that his prisoner appeals regarding these issues were not properly handled and decided by Defendants Bendon and Yee.  Finally, Plaintiff alleges medical malpractice and intentional infliction of emotional distress, under California law.  Plaintiff seeks declarative and monetary relief.

### 1. Eighth Amendment Deliberate Indifference to Serious Medical Needs

Plaintiff's second amended complaint is proceeding under §1983 on allegations that the defendants promulgated and/or implemented policies that resulted in deliberate indifference to his serious medical needs in violation of the Eighth Amendment.[8]  (Doc. 45.)  The claims in this action arise from Defendants' alleged policy and/or practice of not providing separate meals for diabetics; not providing for Plaintiff to have multiple daily blood glucose finger-sticks; and not providing Plaintiff with opportunity to exercise out of his cell.  Plaintiff alleges that he was unable to control his blood sugar levels as a result of the food that he was fed, his inability to obtain daily exercise out of his cell, and his inability to closely track his blood sugar levels – via multiple daily finger-sticks.  Plaintiff argues that these circumstances caused him to suffer daily sickness, and potentially life threatening medical conditions due to the poor control of his

---

[8]Throughout his moving and opposition papers, Plaintiff uses terminology so as to implicate other constitutional claims such as "retaliation," "conspiracy," "safety," "failure to protect," and appears to attempt to implicate the persons who processed his inmate appeals.  The Court screened Plaintiff's second amended complaint and found cognizable only the claims against the named defendants "for enacting, implementing, and/or enforcing policies and/or practices that resulted in deliberate indifference to plaintiff's serous medical needs, in violation of the Eighth Amendment."  (Doc. 45.)  Plaintiff may not now expand the scope of this litigation.  See Gilmore v. Gates, McDonald & Co., 382 F.3d 1312, 1315 (11th Cir. 2004).

1   diabetes.

2       "[T]o maintain an Eighth Amendment claim based on prison medical treatment, an

3   inmate must show 'deliberate indifference to serious medical needs.'" Jett v. Penner, 439 F.3d

4   1091, 1096 (9th Cir. 2006) (quoting Estelle v. Gamble, 429 U.S. 97, 106, 97 S.Ct. 295 (1976)).

5   The two part test for deliberate indifference requires the plaintiff to show (1) "'a serious medical

6   need' by demonstrating that 'failure to treat a prisoner's condition could result in further

7   significant injury or the unnecessary and wanton infliction of pain,'" and (2) "the defendant's

8   response to the need was deliberately indifferent." Jett, 439 F.3d at 1096 (quoting McGuckin v.

9   Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on other grounds, WMX Techs., Inc. v.

10  Miller, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc) (internal quotations omitted)).  Deliberate

11  indifference is shown by "a purposeful act or failure to respond to a prisoner's pain or possible

12  medical need, and harm caused by the indifference." Id. (citing McGuckin, 974 F.2d at 1060).

13  A prison official does not act in a deliberately indifferent manner unless the official "knows of

14  and disregards an excessive risk to inmate health or safety." Farmer v. Brennan, 511 U.S. 825,

15  837 (1994).

16      Further, all of the defendants Plaintiff proceeds against hold supervisorial positions, to

17  wit: Terhune is the CDC Director; Presley is the Secretary of the Youth and Adult Corrections

18  Agency; Galaza is the Warden at CSP Corcoran; and Yee and Bendon are/were Chief Medical

19  Officers.

20      Under section 1983, liability may not be imposed on supervisory personnel such as

21  Defendants for the actions of their employees under a theory of respondeat superior.  When the

22  named defendant holds a supervisorial position, the causal link between the defendant and the

23  claimed constitutional violation must be specifically alleged.  See Fayle v. Stapley, 607 F.2d 858,

24  862 (9th Cir. 1979); Mosher v. Saalfeld, 589 F.2d 438, 441 (9th Cir. 1978), cert. denied, 442

25  U.S. 941 (1979).  Plaintiff must demonstrate that Defendants either: personally participated in the

26  alleged deprivation of constitutional rights; knew of the violations and failed to act to prevent

27  them; or promulgated or "implemented a policy so deficient that the policy 'itself is a repudiation

28  of constitutional rights' and is 'the moving force of the constitutional violation.'"  Hansen v.

1  Black, 885 F.2d 642, 646 (9th Cir. 1989) (internal citations omitted); Taylor v. List, 880 F.2d

2  1040, 1045 (9th Cir. 1989).

3       To state a claim under section 1983, a plaintiff must allege that (1) the defendant acted

4  under color of state law and (2) the defendant deprived him of rights secured by the Constitution

5  or federal law.  Long v. County of Los Angeles, 442 F.3d 1178, 1185 (9th Cir. 2006).  "A person

6  deprives another of a constitutional right, where that person 'does an affirmative act, participates

7  in another's affirmative acts, or omits to perform an act which [that person] is legally required to

8  do that causes the deprivation of which complaint is made.'"  Hydrick v. Hunter, 500 F.3d 978,

9  988 (9th Cir. 2007) (quoting Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978)).  "[T]he

10 'requisite causal connection can be established not only by some kind of direct, personal

11 participation in the deprivation, but also by setting in motion a series of acts by others which the

12 actor knows or reasonably should know would cause others to inflict the constitutional injury.'"

13 Id. (quoting Johnson at 743-44).  "Although there is no pure *respondeat superior* liability under §

14 1983, a supervisor [may be held] liable for the constitutional violations of subordinates 'if the

15 supervisor participated in or directed the violations, or knew of the violations and failed to act to

16 prevent them.'"  Hydrick v. Hunter, 500 F.3d 978, 988 (9th Cir. 2007) (quoting Taylor v. List,

17 880 F.2d 1040, 1045 (9th Cir. 1989)).

18       Plaintiff's Burden -- Since he has the burden of persuasion at trial, as the moving party in

19 his motion, Plaintiff must show that there is no triable issue as to the matters alleged in his own

20 pleadings.  Calderon v. United States 799 F.2d 254, 259 (6th Cir. 1986).  Therefore, Plaintiff must

21 prove that each defendant promulgated or implemented a policy that Plaintiff, as a diabetic

22 inmate: (1) be served food that was medically inappropriate so as to rise to the level of deliberate

23 indifference to his serious medical needs (diabetes) – which presupposes an essential element

24 that the diet provided to Plaintiff was inadequate for his diabetic needs; or (2) be unable to obtain

25 the number of glucose finger-sticks that were medically required so as to rise to the level of

26 deliberate indifference to his serious medical needs; or (3) be unable to obtain sufficient exercise

27 to maintain his blood sugar levels so as to rise to the level of deliberate indifference to his serious

28 medical needs.

1    Defendants' Burden -- Since they do not have the burden of persuasion at trial, the

2    defendants may carry their burden of production on summary judgment either by disproving an

3    essential element of Plaintiff's claims, or by showing that Plaintiff lacks sufficient evidence of an

4    essential element to carry his burden of persuasion at trial.  See Celotex Corp. v. Catrett, 477

5    U.S. 317 (1986) and Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc. 210 F.3d 1099, 1102

6    (9th Cir. 2000).

7    "Deliberate indifference is a high legal standard."  Toguchi v. Chung, 391 F.3d 1051,

8    1060 (9th Cir. 2004).  "Under this standard, the prison official must not only 'be aware of the

9    facts from which the inference could be drawn that a substantial risk of serious harm exists,' but

10   that person 'must also draw the inference.'"  Id. at 1057 (quoting Farmer, 511 U.S. at 837).  "'If a

11   prison official should have been aware of the risk, but was not, then the official has not violated

12   the Eighth Amendment, no matter how severe the risk.'"  Id. (quoting Gibson v. County of

13   Washoe, Nevada, 290 F.3d 1175, 1188 (9th Cir. 2002)).  "[A]n 'inadvertent [or negligent] failure

14   to provide adequate medical care' alone" is insufficient to state a claim, and an isolated incident

15   when compared to overall treatment  "'ordinarily militates against a finding of deliberate

16   indifference.'"  Jett, 439 F.3d at 1096 (quoting McGuckin, 974 F.2d at 1060 (internal quotations

17   and citations omitted)).

18          **a.       Diabetic Diet**

19          **(1)       Plaintiff's Motion for Summary Judgment**

20   Plaintiff argues that he is entitled to judgment as a matter of law on his claim that

21   Defendants acted with deliberate indifference to his serious medical needs (diabetes) by

22   implementing the policy for CSP-Corcoran to serve the Heart Healthy diet with self-abstention

23   education for diabetics.  Plaintiff contends that he requested a therapeutic medical diet because

24   the foot served at CSP-Corcoran caused his blood sugar levels to increase too high when he ate

25   the meals served, and/or caused his blood sugar levels to decrease too low when he did not eat

26   the meals served for fear of too high blood sugar levels caused by eating the foods served. (Doc.

27   139-1, Wilson Dec., ¶ 2.)  Plaintiff contends that he did not receive therapeutic diabetic medical

28   diets while at CSP-Corcoran.  (Id., ¶ 3.)  Plaintiff contends he did not receive any education

regarding the foods he could safely eat on the general population menus, so as to cause him to be sick on a daily basis. (Id., ¶ 4.) Plaintiff admits that, on January 18, 2001, Dr. Meis ordered he be given an evening diabetic snack. (Doc. 157, p. 2, ¶ 18, and Exhibit B, p. 26.) Plaintiff contends his blood sugar levels were uncontrolled during his tenure at CSP-Corcoran. (Id., p. 3, ¶ 10, and Exhibits B & C.) Plaintiff admits that he was seen by the dietician for his diabetes on February 11, 2002, and that he was told he could decrease his intake of food because she thought Plaintiff was overweight, but contends that when he asked which foods to avoid, the dietician told Plaintiff he needed to pick and choose from the foods offered on the general population menus. (Id., pp. 3-4, ¶ 16, and Exhibit B.) Further, Plaintiff contends that he was not given any written information, or educated on what foods to avoid and/or eat from the general population menu. (Id., pp. 3-4, ¶ 16, and Exhibit B.) Plaintiff contends that CDCR has policies and procedures that do not provide diabetic inmates therapeutic diets. (Id., p. 6, ¶ 22, and Exhibit D, pp. 1-6.) Plaintiff contends the CDCR's standardized weekly menu fails to educate and/or point out which foods are safe for diabetic inmates to eat and/or the proper amounts to eat and/or choose from. (Id., p. 6, ¶'s 23 & 27, and Exhibits E, pp. 1-14, & C, p. 5.) Plaintiff further contends that, while the Heart Healthy menus are designed to meet the nutritional needs of normal, healthy adults, diabetic inmates are not normal, healthy adults, and they need a special diet and menu to control their diabetes. (Id., p. 6, ¶ 24.) Plaintiff also contends that, while CDCR's daily menu may contain 400 calories more per day than the minimum required by the average adult such that diabetic inmates might discard some foods and still receive sufficient caloric intake to maintain proper nutrition, CDCR's policies and procedures fail to provide diabetic inmates any means of what foods they can safely eat off the weekly menu. (Id., p. 6, ¶ 25, and Exhibit E, pp. 3-14.) Plaintiff contends that a diabetic inmate cannot obtain proper nourishment on the Heart Healthy diet without numerous adverse health effects as there is no way for an average diabetic inmate to properly count their carbohydrate intake off the weekly menu. (Id., p. 6, ¶ 26, and Exhibit E, pp. 3-14.)

Plaintiff's contention that the diet he received was inappropriate for him is premised on excerpts from a book published by the American Diabetes Association. (Doc. 157, pp. 3,4-5, 7

¶'s 10, 11, 20, 28 , and Exhibit C.)  However, while the excerpts submitted by Plaintiff mention diet and intake of carbohydrates and/or sugars, they do not  show that the Heart Healthy diet with self avoidance, would pose a risk to a diabetic inmate.  None of Plaintiff's other evidence meets his burden of showing that the policy and procedure at CSP-Corcoran of serving the Heart Healthy diet with education on self avoidance to diabetics, posed a risk to his diabetic condition.  Since Plaintiff failed to show that the Heart Healthy diet posed a risk to his diabetic condition, he has also not met his burden of showing that any of the named defendants knew of a risk to his serious medical condition posed by the diet and were deliberately indifferent thereto via continued implementation of serving the Heart Healthy diet with self avoidance education for diabetics.  Even if Plaintiff had shown that the Heart Healthy diet posed a risk to his diabetic condition, he has failed to show any evidence that any of the defendants acted with deliberate indifference towards him.

Plaintiff has shown that he disagrees with prison officials over the diet that should be served to diabetic inmates.  However, mere differences of opinion between a prisoner and prison medical staff as to proper medical care do not give rise to a § 1983 claim. See Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir.1996); Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir.1989); Franklin v. Oregon, 662 F.2d 1337, 1334 (9th Cir.1981).

There is no evidence from which a trier of fact could conclude either that any of the defendants knew, based on Plaintiff's medical condition, that the Heart Healthy diet with self-abstention education would pose a substantial risk of serious harm to Plaintiff, but disregarded that risk anyway, or that there was a policy or practice, attributable to any of the defendants, of not educating diabetic inmates, or of not serving the Heart Healthy diet.

At best, Plaintiff's contentions that he did not receive clear education as to what foods he should avoid, and/or the carbohydrate levels of various foods, might amount to negligence.  However, mere "indifference," "negligence," or "medical malpractice" will not support a claim of deliberate indifference under the Eighth Amendment.  Broughton v. Cutter Laboratories, 622 F.2d 458, 460 (9th Cir. 1980), citing Estelle, 429 U.S. at 105-06.  Even gross negligence is insufficient to establish deliberate indifference to serious medical needs.  See Wood v.

1    Housewright, 900 F.2d 1332, 1334 (9th Cir. 1990).

2           Further, even if Plaintiff met his burden to show that the diet he was served was

3    unconstitutional, Plaintiff fails to show that any of the named defendants personally participated

4    in the alleged deprivation of constitutional rights; knew of the violations and failed to act to

5    prevent them; or promulgated or "implemented a policy so deficient that the policy 'itself is a

6    repudiation of constitutional rights' and is 'the moving force of the constitutional violation.'"

7    Hansen v. Black, 885 F.2d 642, 646 (9th Cir. 1989) (internal citations omitted); Taylor v. List,

8    880 F.2d 1040, 1045 (9th Cir. 1989).  In fact, Defendants present contradicting evidence that

9    show that Susan B. Summerset, R.D. (who is not a defendant in this action) and the Standard

10   Menu Review Team (SMRT) were and are responsible for preparing the menus of meals served

11   at CDCR facilities, including CSP-Corcoran.

12          Thus, Plaintiff is not entitled to summary judgment regarding Plaintiff's allegations of

13   Defendants' deliberate indifference to his serious medical needs via the policy and

14   implementation of serving the Heart Healthy diet, with education on self-avoidance, to diabetic

15   inmates.

16                        **(2)  Defendants' Cross-Motion for Summary Judgment**

17          Turning to Defendants' cross-motion, Defendants argue that they are entitled to judgment

18   as a matter of law because the Heart Healthy diet, with education, is an acceptable and

19   appropriate diet for diabetic inmates.  Defendants have submitted evidence that the CDCR has

20   policies and procedures regarding outpatient therapeutic diets.  (Doc. 149-1, p. 6, ¶ 32, Def

21   Exhibit C, Sommerset Dec., ¶ 3.)  Defendants contend that the outline for therapeutic diets are

22   set forth in Chapter 20 of the Policies and Procedures issued by CDCR's Health Care Services

23   Division.  (Doc. 149-1, p. 6, ¶ 33 Attachment 1 to Def Exhibit C.)  Defendants contend that since

24   1997, it has been CDCR's policy to provide inmates with a Heart Healthy diet, which is one with

25   restricted sodium and fats.  (Doc. 149-1, p. 6, ¶ 34, Def Exhibit C, Sommerset Dec., ¶ 3.)

26   Defendants contend that there is a standardized heart healthy menu for all prisons in California,

27   designed to meet the nutritional needs of normal, healthy adults, which is composed by the

28   Standard Menu Review Team (SMRT), with oversight and input from Registered Dietician S.

Sommerset. (Doc. 149-1, pp. 6-7, ¶ 35, Def Exhibit C, Summerset Dec., ¶ 3.)  Defendants also

contend that diabetic inmates receive dietary education provided by health care services staff and

CDCR physicians to responsibly manage making food choices from the standard prison meal and

counsel regarding the ramifications of non-compliance with the recommended dietary

modifications – which is in line with current recommendations from the American Diabetes

Association (ADA).  (Doc. 149-1, p. 7, ¶ 36, Def Exhibit C, Summerset Dec., ¶ 4.)  Defendants

contend that, since 1994, the ADA has maintained that what is healthy for diabetics is also

healthy for anyone who wants to eat well and that today, diabetics are being taught to choose

healthy eating habits, just as non-diabetics, built around the Dietary Guidelines for Americans.

(Doc. 149-1, p. 7, ¶ 37, Def Exhibit C, Sommerset Dec., ¶ 4.)  Defendants further contend that,

one of the policy reasons for implementation of the "Heart Healthy" diet was to improve the

health of all inmates, including diabetic inmates and that the Health Care Services Division has

determined that the Heart Healthy diet is appropriate for inmates who have hypertension or

diabetes.   (Doc. 149-1, p. 7, ¶ 38, Def Exhibit C, Summerset Dec., ¶ 6.)  Defendants contend that

the daily menu contains approximately 400 calories more per day than the minimum amount

required by the average, moderately active adult to maintain proper nutrition and therefore,

diabetic inmates can discard foods they cannot eat and still receive an adequate amount of daily

nutrition.  (Doc. 149-1, p. 7, ¶ 39, Def Exhibit C, Summerset Dec., ¶ 5.)  Defendants contend that

diabetic inmates who properly count their carbohydrates and consider the nutritional value of the

food items on the Heart Healthy diet can obtain proper nourishment from that diet without

adverse health effects.  (Doc. 149-1, p. 7, ¶ 40, Def Exhibit C, Summerset Dec., ¶ 8.)  Defendants

also contend that, although diabetic inmates are provided with the education necessary to make

informed choices about the food items on the diet, it is their responsibility to make proper

choices.  (Doc. 149-1, p. 7, ¶ 41, Def Exhibit C, Summerset Dec., ¶ 9.)   Defendants finally

contend that CDCR's Heart Healthy diet provides suitable menu items for diabetics, but requires

that they make proper choices about which items, and how many food items, they consume, and

that with proper food choices, inmates such as Plaintiff can maintain proper health on a heart

healthy diet.  (Doc. 149-1, p. 8, ¶ 42, Def Exhibit C, Summerset Dec., ¶ 10 & 19.)

1       Defendants have met both their initial burden of production and the ultimate burden of

2  persuasion on the issue regarding the diet served to Plaintiff.  The have disproved an essential

3  element of Plaintiff's claim since they have shown that implementation of the policy of serving

4  the Hearth Healthy diet with education on self avoidance does not pose a risk to Plaintiff's

5  diabetic condition.  Once again, whether Plaintiff received the necessary education does not

6  present a triable issue of fact regarding a constitutional violation.

7       Thus, Defendants' are entitled to summary judgment regarding Plaintiff's allegations of

8  their deliberate indifference to Plaintiff's serious medical needs via the policy and

9  implementation of serving the Heart Healthy diet, with education on self-avoidance, to diabetic

10  inmates.

11             **B.  Daily Multiple Finger-sticks**

12                **(1)  Plaintiff's Motion for Summary Judgment**

13       Plaintiff argues that he is entitled to judgment as a matter of law on his claim that

14  Defendants acted with deliberate indifference to his serious medical needs (diabetes) by

15  implementing a policy which failed to allow diabetics numerous daily testing and documentation

16  of blood sugar levels via finger-sticks.

17       Plaintiff contends that he did not receive sufficient finger-sticks to be able to adequately

18  monitor and control his blood sugar.  (Doc. 139-1, p. 2, ¶ 5; p. 4, ¶'s 3, 6, & 7; and Exhibits B, C,

19  D, G, L, and N.)  On May 1, 2001, Plaintiff filed an appeal/grievance requesting a blood glucose

20  testing machine and testing supplies.  Plaintiff contends that he was denied access to check his

21  blood sugar levels at the facility-C medical clinic as needed to monitor and control his blood

22  sugar levels.  (Doc. 147-1, p. 3, ¶ 7.)  Plaintiff contends that the ADA standard of care for

23  checking blood sugar levels is up to 8-times per day.  (Id., p. 3, ¶ 11, and Exhibit C, p.13.)

24  Plaintiff admits that, on July 18, 2001, twice weekly finger-sticks were ordered for him.  (Doc.

25  157, p. 3, ¶ 11, and Exhibit B.)

26       Plaintiff's contention that he did not receive sufficient finger-sticks to adequately monitor

27  and control his blood sugar levels appears also to be premised on excerpts from the book

28  published by the ADA.  (Doc. 157, pp. 3,4-5, 7 ¶'s 10, 11, 20, 28 , and Exhibit C.)  However,

while the excerpts submitted by Plaintiff mention monitoring one's blood sugar levels via finger-

sticks, they do not show any specific number of times per day that one's blood sugar levels

should be checked.  In fact, the book states "[y]our diabetes care provider can help you figure out

when to check your blood glucose. ... There are eight check times for you to choose from...."

(Doc. 157, p. 66.)  Thus, the evidence that Plaintiff submitted does not show that he required a

certain number of finger-sticks per day to adequately monitor his blood sugar level.  Rather,

Plaintiff's own evidence indicates that a medical provider should determine when one's blood

sugar levels should be checked – not that Plaintiff needed a specific number of finger-sticks per

day.  Plaintiff failed to submit any evidence by a medical provider to show that he did not receive

a sufficient number of finger-sticks to monitor his blood sugar levels.  Further, since Plaintiff

failed to meet his burden of showing that he did not receive a sufficient number of finger-sticks,

he also is unable to meet his burden of showing that his inability to receive more finger-sticks

was caused by deliberate indifference to his diabetes by any prison personnel.  Even if Plaintiff

had shown that he should have received more numerous finger-sticks, he has failed to show any

evidence that any of the defendants intentionally restricted his access to blood sugar monitoring

out of deliberate indifference to Plaintiff's diabetic condition.

Plaintiff has shown that he disagrees with prison officials over the number of finger-

sticks he should have received to monitor and control his diabetes.  However, once again, mere

differences of opinion between a prisoner and prison medical staff as to proper medical care do

not give rise to a § 1983 claim. See Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir.1996);

Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir.1989); Franklin v. Oregon, 662 F.2d 1337, 1334 (9th

Cir.1981).

Plaintiff's moving papers might be construed to contend that Defendants' alleged failures

to provide numerous daily finger-sticks constituted a delay of Plaintiff's medical care/treatment

in deliberate indifference to his serious medical needs.  However, where the prisoner is alleging

that delay of medical treatment evinces deliberate indifference, the prisoner must show that the

delay led to further injury.  See McGuckin v. Smith 974 F.2d 1050, 1060; Shapely v. Nevada Bd

of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985) (per curiam).  Plaintiff did not submit

1  evidence to show any injuries he sustained as a result of not receiving more frequent finger-
2  sticks.

3      At best, Plaintiff's contentions that he did not receive enough finger-sticks to adequately
4  monitor and control his diabetes might amount to negligence.  However, once again, mere
5  "indifference," "negligence," or "medical malpractice" will not support a claim of deliberate
6  indifference under the Eighth Amendment.  Broughton v. Cutter Laboratories, 622 F.2d 458, 460
7  (9th Cir. 1980), citing Estelle, 429 U.S. at 105-06.  Even gross negligence is insufficient to
8  establish deliberate indifference to serious medical needs.  See Wood v. Housewright, 900 F.2d
9  1332, 1334 (9th Cir. 1990).  (See discussion herein below regarding Plaintiff's medical
10 malpractice/professional negligence claims under state law.)

11     There is no evidence from which a trier of fact could conclude either that any of the
12 Defendants knew, based on Plaintiff's medical condition, that he was not receiving a sufficient
13 number of finger-sticks to adequately monitor his blood sugar levels so as to pose a substantial
14 risk of serious harm to Plaintiff, but disregarded that risk anyway, or that there was a policy or
15 practice, attributable to any of the defendants, of not providing finger-sticks as prescribed by a
16 physician for diabetic inmates.

17     Thus, Plaintiff is not entitled to summary judgment regarding his allegations of
18 Defendants' deliberate indifference to his serious medical needs via the number of finger-sticks
19 he received to monitor and control his blood sugar levels.

20                    **(2)  Defendants' Motion for Summary Judgment**

21     Defendants contend that Plaintiff's medical records show that he was provided "other
22 medical treatment when needed."  (Doc. 148-1, p. 8, citing DUF 24-28.)  However, on this issue,
23 Defendants' statement of undisputed facts merely show a number of times that finger-sticks were
24 ordered and Plaintiff's blood sugar levels.  (Doc. 149-1, pp. 5 & 6, ¶'s 27, 28, 29, 30, & 31.)

25     Defendants have not met both their initial burden of production and/or their ultimate
26 burden of persuasion on the issue regarding the number of finger-sticks Plaintiff received to
27 monitor and control his blood sugar levels.  The only evidence Defendants submit on this point
28 shows that Plaintiff had finger-sticks ordered for him on a few occasions and that blood sugar

levels were recorded.  They have failed to disprove any essential element of Plaintiff's claim since they have failed to present any evidence to show that the number of finger-sticks Plaintiff received were medically adequate, that the procedures for Plaintiff to receive those finger-sticks were appropriate, nor have they submitted any evidence to address whether any of the defendants were deliberately indifferent to Plaintiff's diabetic condition in their involvement in Plaintiff's obtaining of finger-sticks.

Thus, Defendants' are not entitled to summary judgment regarding Plaintiff's allegations of Defendants' deliberate indifference to his serious medical needs via the number of finger-sticks he received to monitor and control his blood sugar levels.

### C. Exercise

#### (1)  Plaintiff's Motion for Summary Judgment

Plaintiff asserts that, due to Defendants' policies and procedures, he was denied regular outside exercise in deliberate indifference to his serious medical condition (diabetes).

Plaintiff contends that, due to various medical ailments, he had numerous medical orders (chrono's) written by several medical doctors addressing his various needs – including use of a wheelchair.  Plaintiff contends that he needs the wheelchair to walk behind for short distances (presumably as a form of exercise).  (Doc. 139-1, p. 12 and Exhibit E.)  Plaintiff contends that, on April 10, 2001, he received a daily exercise chrono to exercise with "both tiers" and to use the day-room as scheduled with his building.  (Id.)  Plaintiff contends that he was only allowed out of his cell on "certain occasions," rather than daily for exercise.  (Id.)  On June 1, 2001, Plaintiff was transferred to Administrative Segregation Unit (Ad Seg), for 61 days, where he contends he was only allowed to exercise out of his cell for one-hour with his wheelchair on one day as there was no access for wheelchairs in Ad Seg.  (Doc. 139-1, p. 13.)  Plaintiff further contends that, in October of 2001, he submitted a grievance regarding his exercise (and other issues), which was partially granted.  However, he continued to be denied daily exercise out of his cell.  (Id. and Exhibit Bc.)  In the second level of review, Dr. Bhatt stated that "there is no daily therapeutic exercise. . . .  You are granted yard time for exercise and may also exercise in your cell. . . ."  Plaintiff continued to be denied daily exercise outside of his cell.  (Doc. 139-1, p. 13.)  Plaintiff

1   also contends that, on November 13, 2001, Dr. Pillor issued a chrono for Plaintiff to have

2   "permanent wheelchair use."  Plaintiff further contends that, on November 27, 2001, Dr. Pillor

3   rescinded all of Plaintiff's chronos, including his wheelchair – which later that evening, was

4   confiscated for 61 days.  (Doc. 139-1, p. 14.)  Plaintiff's wheelchair was returned to him on

5   January 26, 2002.  (Id.)

6        "'[S]ome form of regular outdoor exercise is extremely important to the psychological

7   and physical well being of the inmates.'"  Allen v. Sakai, 48 F.3d 1082, 1087 (9th Cir. 1995)

8   (quoting Spain v. Procunier, 600 F.2d 189, 199 (9th Cir. 1979)).  Thus, "[the] deprivation of

9   outdoor exercise [can] constitute cruel and unusual punishment."  Allen, 48 F.3d at 1087.

10   However, the temporary denial of outdoor exercise with no medical effects is not a substantial

11   deprivation.  May v. Baldwin, 109 F.3d 557, 565 (9th Cir. 1997).

12        Plaintiff contends that his diabetes required daily exercise out of his cell – for which he

13   apparently needed a wheelchair to walk behind.  The excerpts from the ADA book, which

14   Plaintiff relied on as discussed previously, but did not cite for this issue, indicate that one may be

15   advised by their doctor to try taking a walk or some other exercise or activity to treat high blood

16   glucose.  (Doc. 157, Exhibit C.)  Plaintiff contends that Defendants' denial of daily exercise

17   constitutes deliberate indifference.  However, Plaintiff submits no evidence to show that any of

18   his physicians indicated that his diabetes required only out-of-cell exercise.  There is in fact

19   exhibits that indicate Dr. Bhatt instructed Plaintiff on therapeutic exercises he could do in his

20   cell.  It also appears Plaintiff intends to argue that removal of a wheelchair denied him the ability

21   to exercise so as to constitute deliberate indifference.  However, the record submitted by Plaintiff

22   of that event states that Dr. Pillor evaluated him and determined that he no longer needed the

23   wheelchair.  Dr. Pillor is not a named defendant in this action and Plaintiff shows no evidence

24   that any of the named defendants had any involvement in Dr. Pillor's decision.  Further,

25   Defendant Bendon's response to a number of Plaintiff's appeals indicates that a walker was

26   approved for Plaintiff's use so as to assist weaning him from the wheelchair.

27        Plaintiff also fails to show that he faced a substantial risk of harm solely related to a lack

28   of out of cell exercise.  Thus, none of the named defendants could have known that he would

1    face a substantial risk of harm via lack of out of cell exercise, to have disregarded and failed to

2    take reasonable abating measures. Farmer, 511 U.S. at 837-45.

3          In Plaintiff's verified motion and supporting memorandum of points and authorities,

4    Plaintiff contends that there was a period of 61 days in Ad Seg. in which he was allowed to

5    exercise out of his cell for one hour on only one day.  This was because there was no access for

6    wheelchairs in Ad Seg.  (Doc. 139-1, p. 13.)  This is the only specific evidence submitted by

7    Plaintiff that could rise to the level of a constitutional violation regarding Plaintiff's out-of-cell

8    exercise.  None of Plaintiffs 200+ pages of exhibits explicitly document Plaintiff's out-of-cell

9    exercise – or any lack thereof.  However, this was a temporary denial of outdoor exercise with no

10   medical effects shown by Plaintiff such that it is not a substantial deprivation. May v. Baldwin,

11   109 F.3d 557, 565 (9th Cir. 1997).

12         Plaintiff also does not submit any evidence from which a trier of fact could conclude

13   either that any of the Defendants knew, based on Plaintiff's medical condition, that he was not

14   receiving a sufficient amount of out-of-cell exercise so as to pose a substantial risk of serious

15   harm to Plaintiff, but disregarded that risk, or that there was a policy or practice, attributable to

16   any of the Defendants, of not providing diabetic inmates with sufficient out-of-cell exercise.

17         Thus, Plaintiff is not entitled to summary judgment on his allegations of Defendants'

18   deliberate indifference to his serious medical needs via failing to permit him daily out-of cell

19   exercise.

20                      **(2)  Defendants' Motion for Summary Judgment**

21         In their memorandum of points and authorities in support of their opposition to Plaintiff's

22   motion and their own cross-motion, Defendants fail to address Plaintiff's contentions regarding

23   their alleged deliberate indifference to his serious medical needs via failing to permit him daily

24   out-of-cell exercise other than to state that Plaintiff's medical records show that he was

25   "encouraged to get more exercise." (Doc. 148-1, p. 8, DUF 24-28.)  In the statements of disputed

26   and undisputed fact, Defendants contend that Plaintiff was examined by Dr. Pillor on several

27   occasions, and that Dr. Pillor determined that Plaintiff did not need a wheelchair to ambulate.

28   (Doc. 147-1, pp. 5-7, ¶'s 12, 13, 14, & 15, Doc. 149-1, p. 4, ¶ 24.)  Defendants also contend that

Dr. Bhatt saw Plaintiff on March 14, 2002 and indicated that Plaintiff could use his wheelchair on an "as needed" basis, but that he needed to get out of the wheelchair entirely.  (Doc. 149-1, p. 5, ¶ 26, Def. Exh. B-1, p. 113.)  None of this addresses the amount of out-of-cell exercise Plaintiff actually received.

Defendants have not met both their initial burden of production and/or their ultimate burden of persuasion on the issue regarding out-of-cell exercise Plaintiff received. Defendants did not submit any evidence as to the dates and length of time that Plaintiff was provided with out-of-cell exercise, nor did they address what instruction Plaintiff may have been given regarding exercising in his cell.

Thus, Defendants' are not entitled to summary judgment on Plaintiff's allegations of Defendants' deliberate indifference to his serious medical needs regarding his out-of-cell exercise.

### e. Prisoner Grievances/Appeals

### (1) Plaintiff's Motion for Summary Judgment

As stated in this Court's findings and recommendations on Defendants' motion to dismiss, Defendants Dr. Bendon and Dr. Yee are/ were Chief Medical Officers at CSP-Corcoran. As to these allegations, Plaintiff is required to show that these two defendants caused deliberate indifference to his serious medical needs via a supervisory liability theory – i.e. that they either: personally participated in the alleged deprivation of constitutional rights; knew of the violations and failed to act to prevent them; or promulgated or "implemented a policy so deficient that the policy 'itself is a repudiation of constitutional rights' and is 'the moving force of the constitutional violation.'"  Hansen v. Black, 885 F.2d 642, 646 (9th Cir. 1989) (internal citations omitted); Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989).

Plaintiff shows that he mailed a letter to Dr. Yee and that Dr. Yee issued a number of medical chronos addressing various of Plaintiff's physical complaints – none of which show that Dr. Yee was personally deliberately indifferent to Plaintiff's diabetic condition, or in some way promulgated or implemented a policy that caused a violation of Plaintiff's constitutional rights. Plaintiff shows that on January 22, 2001, Dr. Yee co-signed three separate year long chronos for

1    Plaintiff to receive a diabetic snack, to wear soft shoes, and to use a cane.  (Doc. 139-1, p. E1.)

2    On February 14, 2001, Dr. Yee co-signed one year long chrono for Plaintiff to be placed on

3    single cell status.  (Doc. 139-1, p. E4.)  On April 2, 2001, Plaintiff sent a letter to both Dr.

4    Bendon and Dr. Yee regarding his "out of control diabetes" wherein Plaintiff complained that the

5    diet was causing him daily sickness, that he was not allowed to check and document his blood

6    sugar levels before and after each meal, and that he was being denied daily exercise out of his

7    cell.  (Doc. 139-1, p. G2.)  On April 10, 2001,  Dr. Yee co-signed three separate year long

8    chronos, the first of which is not completely copied on the page, the second addressed activity

9    restrictions, and the third indicated that Plaintiff should receive exercise with the upper and lower

10   tiers and use of the day room as scheduled in his building.  (Doc. 139-1, p. E5.)  On April 23,

11   2001, Dr. Yee co-signed a chrono for Plaintiff to have use of a wheelchair to walk any distance

12   more than 100 yards for three months.  (Doc. 139-1, p. E6.)  On May 31, 2001, Dr. Yee co-

13   signed a year long chrono for Plaintiff to have "cell-feeding because of orthopedic problems."

14   (Doc. 139-1, p. E6.)  On September 19, 2001, Dr. Yee co-signed a year long chrono for Plaintiff

15   to have "lower bunk/lower tier placement due to chronic arthritis problems."  (Doc. 139-1, p.

16   E6.)    Plaintiff makes no showing that Dr. Yee was involved in the processing of and/or ruling

17   on Plaintiff's medical grievances/appeals.  Further, none of this shows that Dr. Yee was

18   personally deliberately indifferent to Plaintiff's diabetic condition, or in any way promulgated or

19   implemented a policy or procedure that caused a deprivation of Plaintiff's constitutional rights.

20   If anything, it appears that Dr. Yee approved medical chronos to address various of Plaintiff's

21   medical concerns.  Thus, Plaintiff has not met his burden to be entitled to summary judgment

22   against Dr. Yee.

23          As to Dr. Bendon, Plaintiff shows that he mailed a letter to Dr. Bendon and that Dr.

24   Bendon issued one response to a number of Plaintiff's appeals.  Plaintiff shows that on April 2,

25   2001, Plaintiff sent a letter to both Dr. Bendon and Dr. Yee regarding his "out of control

26   diabetes" wherein Plaintiff complained that the diet was causing him daily sickness, that he was

27   not allowed to check and document his blood sugar levels before and after each meal, and that he

28   was being denied daily exercise out of his cell.  (Doc. 139-1, p. G2.)  Dr. Bendon issued a

response to various of Plaintiff's appeals on May 17, 2001 which he based on extensive review of Plaintiff's medical file and Dr. Bhatt's medical evaluations of Plaintiff.  Dr. Bendon stated that Plaintiff concurred with Dr. Bhatt that Plaintiff had been walking and exercising and that he needed to get weaned off the wheelchair altogether, and in order to facilitate weaning Plaintiff from the wheelchair, a walker had been approved for his use.  Dr. Bendon also stated that he reviewed Plaintiff's pain medications and that Plaintiff was being referred to the Pain Management Committee for review.  Dr. Bendon stated that CSP-Corcoran did not provide special diabetic diets, but that the Registered Dietician had counseled Plaintiff and provided Plaintiff with written documentation regarding foods to eat and avoid for his diabetes.  Dr. Bendon also stated that Dr. Bhatt showed Plaintiff how to perform therapeutic exercises that could be done in Plaintiff's cell, that Plaintiff was thus not being denied therapeutic exercise, and that Plaintiff had been referred and received a physical therapy consult, and that a chrono would not issue allowing him to go to yard with "both upper and lower tiers," but that Plaintiff could access yard during his regularly scheduled time.  Dr. Bendon then addressed other issues in Plainitff's grievances that are not relevant to the issues raised in these motions.  (Doc. 139-1, pp. C6-C7.)  Further, on August 29, 2001, Dr. Bendon issued a second level of review to an appeal by Plaintiff requesting a "blood sugar testing machine and supplies" in his cell so that he might test his blood sugar level as needed in order to control it.  Dr. Bendon responded that Plaintiff received testing for blood sugar levels twice a week from the MTA in the clinic, and that if Plaintiff felt he needed more, he was welcome to schedule an appointment with the yard physician – who determines the number of times an inmate's bloods sugar level should be checked in relation to his condition.  Dr. Bendon further stated that the items Plaintiff requested are not given to inmates due to safety and security concerns.  (Doc. 139-1, p. Bb9.)[9]

Plaintiff fails to show that Dr. Bendon was personally deliberately indifferent to Plaintiff's diabetic condition, or in any way promulgated or implemented a policy or procedure

---

[9] Plaintiff also submitted a number of grievances/appeals filed by other prisoners and rulings thereon by Dr. Bendon and others – which lacked any mention of Plaintiff's condition and/or issues. This case is not a class action and is proceeding solely on Plaintiff's claims.

that caused a deprivation of Plaintiff's constitutional rights. To the contrary, it appears that Dr. Bendon investigated Plaintiff's medical condition and addressed each of Plaintiff's areas of concern – declining yard time with both tiers because a walker and physical therapy consult had been approved and that Dr. Bhatt had shown Plaintiff how to do therapeutic exercises in his cell; that fingersticks had been ordered, but could be increased if the yard physician felt they were necessary for his condition, and that a special diet was not available, but that the Registered Dietician had counseled him and given him written documentation of the foods to eat and to avoid as a diabetic. Whether the other prison staff acted as Dr. Bendon noted might amount to negligence on their part, but certainly does not rise to the level of deliberate indifference by Dr. Bendon. Plaintiff has not met his burden to be entitled to summary judgment against Dr. Bendon.

Plaintiff further argues that Dr. Bendon "illegally combined" numerous of his appeals into one. (Doc. 139-1, p. 14.) However, there is no requirement that an appeals officer must address each of a prisoner's grievances separately. A prisoner has no entitlement to a specific grievance procedure. Ramirez v. Galaza, 334 F.3d 850, 860 (9th Cir. 2003). Thus, Plaintiff is also not entitled to summary judgment against Dr. Bendon for combining his appeals.

### (2)    Defendants' Motion for Summary Judgment

Defendants' arguments that Defendants Bendon and Yee are entitled to summary judgment are, at best, tangential to the issues in this case. Defendants argue that Plaintiff's claims against Defendants Bendon and Yee are without merit since Plaintiff has no right to due process regarding the handling and ruling on his prisoner grievances/appeals.

However, when the Court screened this action it found that Plaintiff had stated cognizable claims against all of the named defendants for enacting, implementing, and/or enforcing policies and/or practices that resulted in deliberate indifference to Plaintiff's serious medical needs in violation of the Eighth Amendment. The Court's ruling on Defendants' motion to dismiss further clarified that Plaintiff's claims against Defendants Bendon and Yee were premised on supervisorial liability (i.e. that Plaintiff would have to submit evidence that they either: personally participated in the alleged deprivation of constitutional rights; knew of the violations and failed to act to prevent them; or promulgated or "implemented a policy so deficient that the

1  policy 'itself is a repudiation of constitutional rights' and is 'the moving force of the

2  constitutional violation'" so as to cause the deliberate indifference to Plaintiff's serious medical

3  needs.  Hansen v. Black, 885 F.2d 642, 646 (9th Cir. 1989) (internal citations omitted); Taylor v.

4  List, 880 F.2d 1040, 1045 (9th Cir. 1989)).  Defendants completely fail to address this theory of

5  liability.

6          Defendants briefly argue that Plaintiff cannot maintain an Eighth Amendment claim

7  against Defendants Bendon and Yee for denying his grievances and requests and state that

8  "[o]nce a prison grievance examiner becomes aware of potential mistreatment, the Eight

9  Amendment does not require him or her to do more than 'review [the prisoner's] complaints and

10 verif[y] with the medical officials that [the prisoner] was receiving treatment."  Greeno v. Daley,

11 414 F.3d 645, 655 (7th Cir. 2005) (citing Spruill, 372, F.3d at 236.)."  Defendants' reliance on

12 Greeno is misplaced.  The prison grievance examiner in Greeno, to whom this standard applied,

13 was a *non-medical* prison personnel.  The discussion on page 655 of Greeno, which is the page

14 number Defendants cited, pertained to medical prison personnel.  However, the specific verbiage

15 and standard quoted by Defendants from Greeno was located on page 656 (not page 655) and it

16 specifically applied to *non-medical* prison personnel who reviewed inmates' medical prison

17 grievances.

18         Defendants Bendon and Yee are/were both Chief Medical Officers and medical doctors.

19 As medical doctors holding supervisorial positions and duties, with the ability to affect the

20 medical care and treatment Plaintiff receives, they are held to both the Eighth Amendment

21 deliberate indifference and supervisorial standards.  Defendants failed to submit any evidence, or

22 argument, addressing possible liability of Defendants Bendon and Yee under either the Eighth

23 Amendment deliberate indifference, or supervisorial standards.  Thus, Defendants Bendon and

24 Yee are not entitled to summary judgment.

25                    **2. State Law – Medical Malpractice/Professional Negligence**

26         Plaintiff claims that the Defendants violated California tort law for medical

27 malpractice/professional negligence by failing "to summon adequate medical care and treatment

28 for his diabetes which includes special therapeutic medical diets, numerous daily fingersticks and

1  documentation of those tests, and daily exercise all of which are necessary to monitor and control

2  his daibetes that resulted in irreparable harm to" Plaintiff.  (Doc. 139-1, p. 19.)

3         To establish medical negligence (malpractice), a plaintiff must state (and subsequently

4  prove) all of the following: (1) that the defendant was negligent; (2) that the plaintiff was

5  harmed; and that the defendant's negligence was a substantial factor in causing the plaintiff's

6  harm.  Ladd v. County of San Mateo (1996) 12 Cal.4th 913, 917; Ann M. v. Pacific Plaza

7  Shopping Center (1993) 6 Cal.4th 666, 673; Restatement Second of Torts, section 328A; and

8  Judicial Council Of California Civil Jury Instruction 400, Summer 2008 Supplement Instruction.

9         Medical professionals are negligent if they fail to use the level of skill, knowledge, and

10  care in diagnosis and treatment that other reasonably careful medical professional would use in

11  the same or similar circumstances.  This level of skill, knowledge, and care is sometimes referred

12  to as "the standard of care."  Landeros v. Flood 17 Cal.3d 399, 408 (1976); see also Brown v.

13  Colm 11 Cal.3d 639, 642–643 (1974); Mann v. Cracchiolo (1985) 38 Cal.3d 18, 36; and Judicial

14  Council Of California Civil Jury Instruction 500, Summer 2008 Supplement Instruction.

15         "[M]edical personnel are held in both diagnosis and treatment to the degree of knowledge

16  and skill ordinarily possessed and exercised by members of their profession in similar

17  circumstances."  Hutchinson v. United States, 838 F.2d 390, 392-93 (9th Cir. 1988) (internal

18  citations omitted).  "[The] standard of care, which is the basic issue in malpractice actions, can

19  be proven only by expert testimony.  Hutchinson, 838 F.2d at 392.  In order to defeat defendant's

20  motion for summary adjudication on his state law claim, plaintiff must come "forward with

21  conflicting expert evidence."  Hutchinson, 838 F.2d at 392-93.

22         The only submissions by Plaintiff on this issue are found in his moving memorandum of

23  points and authorities (solely as quoted in this section), and sparse allegations in his second

24  amended complaint.  Plaintiff fails to submit any expert witness declarations to address the

25  elements of the applicable standard(s) of care, breaches thereof, damages, and their causation.[10]

26

27         [10] Because Plaintiff is not a medical expert, his opinion that he was not provided with an appropriate diet for
diabetics, sufficient finger-sticks, and sufficient out-of-cell exercise is not admissible.  Plaintiff may however testify

28  that he suffered increased symptoms such as headaches, increases in frequency of urination, feelings of being light
headed/dizzy, and increased thirst – none of which address the standard(s) of care or causation.

1    Thus, Plaintiff is not entitled to summary judgment on his allegations that Defendants'

2    actions amounted to medical malpractice/professional negligence.

3    Defendants did not submit any evidence to address Plaintiff's claims of medical

4    malpractice/professional negligence.  They only address Plaintiff's state law contentions under

5    the pendent jurisdiction doctrine, and request that Plaintiff's state law claims be dismissed

6    without prejudice.  Thus, since some of Plaintiff's claims under §1983 survive Defendant's

7    cross-motion for summary judgment, Defendants are not entitled to summary judgment and/or

8    dismissal of Plaintiff's state law claims of medical malpractice/professional negligence.

9    **3. State Law – Intentional Infliction of Emotional Distress (IIED)**

10    Plaintiff claims that the Defendants violated California tort law for intentional infliction

11    of emotional distress by failing "to summon adequate medical care and treatment for his diabetes

12    which includes special therapeutic medical diets, numerous daily finger-sticks and

13    documentation of those tests, and daily exercise all of which are necessary to monitor and control

14    his diabetes that resulted in irreparable harm to" Plaintiff.  (Doc. 139-1, p. 19.)

15    Under California law, the elements of intentional infliction of emotional distress are: (1)

16    extreme and outrageous conduct by the defendant with the intention of causing, or reckless

17    disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or

18    extreme emotional distress; and (3) actual and proximate causation of the emotional distress by

19    the defendant's outrageous conduct.  Simo v. Union of Needletrades, Industrial & Textile

20    Employees, 322 F.3d 602, 621-22 (9th Cir. 2003) (citing to Christensen v. Superior Court, 54

21    Cal.3d 868, 903 (1991)) (quotations omitted).  In addition to the requirement that the conduct be

22    intentional and outrageous, the conduct must have been directed at Plaintiff or occur in the

23    presence of Plaintiff, of whom Defendant was aware.  Simo, 322 F.3d at 622 (citing Christensen,

24    54 Cal.3d at 903) (quotations omitted).  A defendant's conduct must be "extreme and

25    outrageous" to be actionable under California law. Sabow v. United States, 93 F.3d 1445, 1454-

26    55 (9th Cir. 1996) at 1455 citing to Davidson v. Westminster, 32 Cal.3d 197 (1982) ( "Conduct

27    to be extreme and outrageous must be so extreme as to exceed all bounds of that usually tolerated

28    in a civilized community.").

1   Plaintiff's submissions on this issue are found in his moving memorandum of points and

2   authorities (as quoted above in this section), and exceedingly sparse allegations in his second

3   amended complaint.  Plaintiff fails to submit any evidence to show that Defendants' conduct was

4   directed at, or occurred in front of, Plaintiff  with the intent or in reckless disregard of the

5   probability of causing emotional distress; and was extreme so as to exceed all bounds of that

6   usually tolerated in a civilized community; and that Plaintiff  actually suffered severe or extreme

7   emotional distress as a result.[11]

8   Thus, Plaintiff is not entitled to summary judgment on his allegations that Defendants'

9   actions amounted to IIED.

10   Defendants did not submit any evidence to address Plaintiff's claims of IIED.  As stated

11   previously, they only address Plaintiff's state law contentions under the pendent jurisdiction

12   doctrine, and request that Plaintiff's state law claims be dismissed without prejudice.  Thus, since

13   some of Plaintiff's claims under §1983 survive Defendant's cross-motion for summary judgment,

14   Defendants are not entitled to summary judgment and/or dismissal of Plaintiff's state law for

15   IIED.

16   **B.  Defenses – Qualified Immunity**

17   In their cross-motion and opposition to Plaintiff's motion for summary judgment,

18   Defendants contend that they are entitled to qualified immunity.  Government officials enjoy

19   qualified immunity from civil damages unless their conduct violates "clearly established statutory

20   or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald,

21   457 U.S. 800, 818 (1982).  In ruling upon the issue of qualified immunity, the first prong of

22   inquiry is whether, taken in the light most favorable to the party asserting the injury, the facts

23   _____

24   [11] In his unverified first statement of undisputed facts, Plaintiff indicates that Dr. Pillor acted in concert with
"other defendants" to have harm done to Plaintiff by revoking all "double-exercise" chronos for inmates at the

25   facility C-yard then told all inmates this was done because of Plaintiff filing so many grievances to obtain
exercise.  (Doc. 139-1, p. 5) This contention fails for numerous reasons including that no claims of this sort were

26   mentioned in, or found cognizable under Plaintiff's second amended complaint; Dr. Pillor is not a named defendant
in this action; and Plaintiff fails to specifically link these actions to any of the named defendants against which this

27   case is proceeding.  42 U.S.C. § 1983  42 U.S.C. § 1983.  The statute plainly requires that there be an actual
connection or link between the actions of the defendants and the deprivation alleged to have been suffered by

28   Plaintiff.  See Monell v.  Department of Social Services, 436 U.S. 658 (1978); Rizzo v. Goode, 423 U.S. 362 (1976).

1   alleged show the defendant's conduct violated a constitutional right. <u>Saucier v. Katz</u>, 533 U.S.

2   194, 201 (2001). If, and only if, a violation can be made out, the second prong asks whether the

3   right was clearly established. <u>Id</u>. The third prong requires the Court to ascertain whether a

4   reasonable officer in these circumstances would have thought her or his conduct violated the

5   alleged right. <u>Id</u> at 205.

6       The statement that the Eighth Amendment guarantees medical care without deliberate

7   indifference to serious medical needs is a sufficiently narrow statement of the right for

8   conducting the clearly established inquiry. <u>See</u> <u>Kelly v. Borg</u>, 60 F.3d 664, 667 (9th Cir. 1995).

9   Thus, the second prong of the <u>Saucier</u> test is met.

10      As to the third prong, even if Plaintiff has alleged violations of a clearly established right,

11  the government official is entitled to qualified immunity if he or she "could . . . have reasonably,

12  but mistakenly believed that his or her conduct did not violate a clearly established constitutional

13  right." <u>Grossman v. City of Portland</u>, 33 F.3d 1200, 1209 (9th Cir. 1994).

14      Although both the "clearly established right" and "reasonableness" inquiries are question

15  of law, where factual disputes exist, the case cannot be resolved at summary judgment on

16  qualified immunity grounds. <u>See</u> <u>Liston v. County of Riverside</u>, 120 F.2d 965, 975 (9th Cir.

17  1997). In this case, triable factual disputes exist on all but one issue. Accordingly, the Court

18  finds that Defendants are not entitled to qualified immunity in this action and recommends that

19  Defendants' motion for summary judgment on those grounds be denied.

20      **C. Damages – Declaratory Relief**

21      In addition to money damages, Plaintiff seeks declaratory and injunctive relief. "'A case

22  or controversy exists justifying declaratory relief only when the challenged government activity is

23  not contingent, has not evaporated or disappeared, and, by its continuing and brooding presence,

24  casts what may well be a substantial adverse effect on the interests of the petitioning parties.'"

25  <u>Feldman v. Bomar</u>, 518 F.3d 637, 642 (9th Cir. 2008) (quoting <u>Headwaters, Inc. v. Bureau of</u>

26  <u>Land Management, Medford Dist.</u>, 893 F.2d 1012, 1015 (9th Cir. 1989) (internal quotations and

27  citation omitted)). "Declaratory relief should be denied when it will neither serve a useful

28  purpose in clarifying and settling the legal relations in issue nor terminate the proceedings and

1   afford relief from the uncertainty and controversy faced by the parties." <u>U.S. v. State of Wash.</u>,

2   759 F.2d 1353, 1357 (9th Cir. 1985) (citations omitted).  The governmental conduct at issue in

3   this action occurred in 2001 and 2002, and Plaintiff's remedy is damages should he prevail on his

4   claim that his constitutional rights were violated.  The Court recommends dismissal of the

5   declaratory relief claim.

6   **V.    Conclusion**

7          Based on the foregoing, the court HEREBY RECOMMENDS that:

8   1.    Plaintiff's motion for summary judgment, filed February 6, 2007 be DENIED in

9          its entirety; and

10  2.    Defendant's cross-motion for summary judgment, filed May 7, 2007, is

11         GRANTED in part and DENIED in part as follows:

12                A.  As to Plaintiff's claim that the procedure and/or policy, and

13                implementation thereof to serve the Heart Healthy diet with education on

14                self-abstention for diabetics was in deliberate indifference to his serious

15                medical needs – GRANTED;

16                B.  As to Plaintiff's claim that the procedure and/or policy, and

17                implementation thereof under which he allegedly did not receive a

18                sufficient number of finger-sticks to adequately monitor and control his

19                blood sugar in deliberate indifference to his serious medical needs –

20                DENIED;

21                C. As to Plaintiff's claim that the procedure and/or policy, and

22                implementation thereof under which he allegedly did not receive

23                sufficient out of cell exercise in deliberate indifference to his serious

24                medical needs – DENIED;

25                D.  As to Plaintiff's claim against Defendants Bendon and Yee in their

26                supervisorial capacities and for the rulings on Plaintiff's medical

27                grievances/appeals in deliberate indifference to his serious medical needs –

28                DENIED;

1    E.  As to Plaintiff's claims under California law that the actions of the

2         defendants amounted to professional negligence/medical malpractice –

3         DENIED;

4    F.  As to Plaintiff's claims under California law that the actions of the

5         defendants amounted to intentional infliction of emotional distress –

6         DENIED; and

7    G. As to Defendants' claims that they are entitled to qualified immunity –

8         DENIED.

9         These Findings and Recommendations will be submitted to the United States District

10   Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within

11   thirty (30) days after being served with these Findings and Recommendations, the parties may

12   file written objections with the court.  The document should be captioned "Objections to

13   Magistrate Judge's Findings and Recommendations."  The parties are advised that failure to file

14   objections within the specified time may waive the right to appeal the District Court's order.

15   Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

16        IT IS SO ORDERED.

17   **Dated:**   **November 20, 2008**              **/s/ Gary S. Austin**
                                          UNITED STATES MAGISTRATE JUDGE

18

19

20

21

22

23

24

25

26

27

28